To the extent possible, I'd like to reserve three minutes of time. May it please the Court, Bruce Voss for the appellant, Bridge Aina Le'a. Just four months ago, the U.S. Supreme Court changed federal takings law, finding that based on the self-executing character of the Fifth Amendment, a property owner has an irrevocable right of just compensation in federal court immediately upon a taking. This case requires no less based on the plain language of the takings clause. When did the taking take place in this case? I'm sorry, what? When did the taking take place in this case? Your expert talked about the 2009 non-binding vote. The reversion took place in 2011. Your evidence talks about 2009. So for purposes of either Lucas or Penn Central, when did the taking take place according to you? The taking took place, Your Honor, in April 30th of 2009 when the Land Use Commission in unprecedented action did a voice vote that reverted the property to . . . But it didn't. It didn't revert the property. I practiced real estate law for 37 years. It didn't revert it then. Yes, there was a vote. Yes, there was some concern. It probably had some economic impact eventually, but it didn't revert it. As a matter of fact, the commission later on stayed its action, did it not? It did, Your Honor. Okay, so how was the 2009 vote in any way, at least under Lucas and Penn Central, or the Supreme Court's most recent law, a taking? It was a taking because it deprived Bridge and the entity that it was trying to sell the property to, DW, of any economically viable use of the property. Now, it's true that there was an order subject to a condition subsequent on the completion of the 16 townhomes, a condition that was satisfied, as the Hawaii Supreme Court said. Satisfied didn't do any of the infrastructure. When you bought the property in the first place, your own people specified that it would take tens of millions of dollars' worth of infrastructure work that could be done before you could do almost anything. And yet, you had the right by special use permit to do a school, to do agriculture, to do a bunch of other things. As you know, under Lucas, you've got to be deprived of all use of the property. You weren't here, were you? We were, Your Honor, yes. In what way? What about the special use process? This gets to the burdens. We went through every single possible use. Our expert did under Chapter 205. Farms, hydroponic farms, wind farms, all at ranches, everything. As to the special uses under the hypothetical speculative special uses, under the procedure of Takings Law, you have to have more than just a list, a possibility of uses. There was no evidence, and this is the district court's points, that any of those possible hypothetical uses were even physically possible on the land. It was a school. Were they possible long before 2009? I think you bought it, what, 1999? 1999, Your Honor. Yes, sir. What couldn't you do in 2009 as a result of the voice vote of the commission that you could have done in 1999 that would have been any different? We were denied, and DW, who we were attempting to sell the property to, was denied the right to build and develop the approved project. The 2,000 units, the affordable housing, everything that went along with that. You didn't have that in 1999, did you? Yes, we did, Your Honor. All of it? Yes. There was the procedural background of this, if you look in the record, and it's all in the supplemental excerpts, is the land was reclassified in 1989 and again in 1991. But subject to 300 and I forget how many low and moderate income homes having to be built. You said you couldn't do that. It was impossible. It didn't work. So there was all subject to conditions precedent, which you never satisfied, right? But the land was purchased in 1999 at a time when the Land Use Commission had approved reductions from the 60% affordable housing requirement for six virtually identical, at least in size and scope, projects. So the issue is not whether or not what we had, it's whether under the Penn Central test, whether it was reasonable, and that's the words of the United States Supreme Court, whether it was reasonable for a landowner to expect that that amendment could be approved. And, in fact, it was approved, so it's hard for me to say how it was unreasonable for Bridge to expect something that did, in fact, occur with the support then, at least, of the State Planning Office in the County of Hawaii. Let me ask you this first. Do you concede that there's no Lucas claim here? You weren't deprived of every potential value of this property, every potential use, right? That's – first off, no, I disagree with you. There is a Lucas claim here because what you have formulated, Your Honor, is not the test. The test, from Lucas on forward, is whether you were denied any economically viable use, any economically productive use of the property. And based on the reclassification, as the evidence at trial showed, and as the district court found in the order in the J. Moule, Bridge was denied any economically viable use of the property during – From your perspective, so by way of the 2009 oral vote that was never reduced to writing, never reduced to an order, it was only in 2011 that the property, that the reversion took place. But you tie everything, all your evidence ties to 2009, does it not? That – yes, but you're a little bit mixing apples and oranges. Okay. What you're getting at, Your Honor, is the length of the taking. And what you're articulating is indeed the State's argument as to the length of the taking. They were, as Your Honor is supposing here, that's from the point when the taking occurred. But that does not eliminate, under United States Supreme Court law, and this goes first English on forward, Nick said it again just four months ago, that the right of compensation attaches immediately upon a taking, whether that was 2009, as we contended, and whether or not it was 2011, as they contended. And the point of this exercise here, this appeal, is the jury never got that opportunity. Bridge never got its day in court on the issue of just compensation, both as to the rate of return, the loss in value, and as Your Honor is talking about, the length of the taking. So . . . I wanted to shift to the exclusion of your damages expert testimony. Forget maybe for a second about the Rule 37 basis, but the district court's other basis for keeping the testimony out. I wanted to hear what you had to say about that, sir. Are you referring to the refusal to allow Bridge's chief executive to testify? That and the refusal to allow, I can't remember his name, but your retained expert. Retained expert. Very briefly, Judge, I think that as to the testimony by the retained expert, Mr. Berger, I believe it was a clear abuse of discretion because the key point is, by the time the supplements were issued, the procedural posture had changed because the case had settled. The legislature refused to fund the settlement, due in part to the Land Use Commission's own lobbying, and they had nine months from that time, seven months from the time of their . . . I'm not concerned about the Rule 26-37 basis. That's what you're talking about. I'm talking about the judge's alternative determination that actually, your expert's testimony and later your . . . I guess, is it the CEO? Was basically irrelevant because the measure of damages here has nothing to do with the specific rate of return your client could achieve or any particular investor could achieve, but rather it's more of a market-based rate of return. Your initial expert, his testimony said nothing about that. Just on the sort of Daubert Rule 702 theory, it just was not proper expert testimony for the subject the jury was going to have to decide. Respectfully, no, because under Seaboard, the 1923 case, which was repeated again by the U.S. Supreme Court, the objective of taking these laws to put the owner back in the same financial position had the taking not occurred. In this case, Bridge Inalaia was part of a family of companies, which Bridge Capital was the manager. John Baldwin was there to testify. He's a sophisticated lender, investor, manager, that this was the way in which excess money that was derived, in this case the value from the property lost, would have been invested. It's the same, Your Honor, in the situation where REIT has LLCs. If the LLC that's a single entity that owns the property generates income, that money is invested by the REIT, the parent company. The same thing happened here, and Mr. Baldwin's knowledge was particularized knowledge as an owner. But that assumes, of course, that, in fact, the analysis is supposed to focus on the individual plaintiff, and I guess what I'm positing is that as I read the case law, but tell me if you've got other authority, as I read the case law, that basically whatever the individual plaintiff would have done with the money is totally irrelevant to the analysis. The analysis is solely an objective, reasonable, prudent investor standard that is focused on some kind of objective market rate of return, sort of like what your opponent's expert was prepared to testify to. The prudent investor rule, and you can look at this circuit's decision in Schneider, is essentially a legal construct to ensure that just compensation is received because interest is part of just compensation, dating back, as I mentioned, to Seaboard. What was Your Honor's question? What is your best authority for the proposition that, let's say that I'm the CEO of the plaintiff, and I come in and I say, you know what, I would have hit the jackpot with this particular investment, that if I had gotten this pot of money, rather than put it in 30-year Treasury bonds like some fools would have done, I would have done this other sort of more aggressive strategy and I would have made a killing. I think the law is clear that, well, no, we don't measure your damages based on what your own subjective testimony about what you would have done with the money is, right? It's completely objective and market-based. Is that . . . Respectfully, absolutely. Okay. Yeah. So tell me what's your best authority. There are cases, the Pacifica case from the district court, we've sidled any number of district court cases where this evidence is at least admissible because as Mr. Baldwin testified at trial during the takings period, he did, in fact, put bridge capitals and bridge inalays, excess money in a Cambodian bank, a Clita, where it owed approximately 8% . . . Rate of return. That's what I'm saying. You don't get to just say, well, I would have put it in this much riskier . . . I think he was getting, what, 10% or something, interest on bank deposits? But what is even assuming that the reasonably prudent investor standard is an absolute requirement, which it can't be, given that takings laws . . . What is your best authority? You said Pacifica district court case. I'm talking about authority that binds us. What do you got on that front? If you look at cases like Wheeler and Nemers, there's the Harrington case in City of Sonoma, which came up to this Ninth Circuit. In those cases that the evidence was admitted as to what the owner . . . the return that the owner actually achieved or sought to achieve during the time period. And it's critical, Your Honor, because what is a quote-unquote reasonably prudent investor differs based on the property owner who's taken. Obviously, Bridge is different than a person who owns a house who a small strip of land has been taken for a highway. Bridge has the options, has the ability to invest in a diversified manner, and Mr. Baldwin was so prepared to testify. Counsel, what are we to do with the fact that in order for you to . . . your client to have realized the return that you say you would, they would have had to spend millions and millions of dollars to build infrastructure, and without that, you would not have achieved any of the level of return you talk about. Should that be taken into account? What should be . . . The answer is what future expenditures were necessary to create income? No. But what should be . . . I'm sorry. What should be taken into account . . . Present return. Correct, Your Honor. But you were right when you said that Mr. Baldwin said that initially they needed to invest millions of dollars, and Bridge, in fact, did invest millions of dollars, not just in the planning, but $3 million in terms of wells, roads, digging, infrastructure. This is some of the hardest land on the Earth, all lava that requires it to be dynamite. Bridge spent millions of dollars doing that. That is backing reasonable investment-backed expectations. I see . . . Do you want to give some of your time? I do, yes. Thank you. So we'll hear from the State. Good morning, Your Honors, and may it please the Court. My name is Ewan Rayner, appearing on behalf of the State of Hawaii, the State of Hawaii Land Use Commission, and the Land Use Commission individually named commissioners. Your Honors, based on the evidence presented at trial, no reasonable decision-maker, whether an adjudicator or a fact-finder, could conclude that the Land Use Commission's reversion of property was the fundamental equivalent of the direct appropriation of private property. Specifically, the evidence could not establish either that the commission's reversion constituted a total categorical taking under Lucas-Spice's South Carolina Coastal Commission, nor that any of the three Penn Central factors support a verdict that the commission's reversion affected a taking. And even if a reasonable decision-maker could come to either of those conclusions, this Court should nevertheless affirm the District Court's award of nominal damages because it was well within the District Court's discretion to exclude Bridges' proposed expert rate-of-return testimony that neither complied with the Federal Rules of Civil Procedure's expert disclosure rules, nor satisfied the basic requirements of relevance and reliability. Counsel, for our purposes on appeal, do we even get to the issue of the damages testimony if we conclude that there was no Lucas or Penn Central taking? No. No. If there's no liability, there's no need to get to the damages question. Maybe start with Penn Central? Sure. Yeah. So, under Penn Central, one point I would like to make about both Penn Central and Lucas is that the purpose underlying both of those analyses, and this Court and the U.S. Supreme Court have stated several times, that the purpose under those analyses is to identify regulatory actions that are fundamentally equivalent to the classic taking in which a government directly appropriates private property or ousts the owner from his or her domain. So when we're talking about either the Penn Central three-factors analysis or Lucas, that's kind of the prism through which we have to view it. That's true for Lucas, less so for Penn Central. So start with Penn. What do you want to say on that? Because I don't think you're correct as a legal matter in your characterization. Okay. Penn Central taking certainly does not require, and maybe this is where you're going to go, I think you're just flat wrong in saying that basically, I don't know, what did you say, 92.5% or more of the value has to be taken in order for you to even be eligible? We've certainly made that argument. You're definitely wrong. Okay. So that's why I wanted you to start there, because I'm not following you. At minimum, what I think, and the case we've relied on is Colony Co for that, and I acknowledge that there may be alternative readings from what the state, I acknowledge that. But at minimum, what I think that case does is state that the type of percentage diminution that we've argued is not sufficient, is not sufficient unless you can also satisfy the other. And I think Bridges acknowledged that, you know, at minimum that's what Colony Co stands for. 83.4% or whatever we're dealing with here is plenty above whatever sort of the analysis, right? Well, I would disagree. Why? Why 83.4%? Because this court has never recognized a taking in the Penn Central below 95%. That's what this court said in Colony Co. No. No. But why don't you proceed to the second? Sure. Certainly. I don't think that's right at all. So Bridges also hasn't established a second factor. And the law is well established that failure to satisfy either of the first two is fatal to the takings claim. I'm not aware of any case either in this circuit or any other where a court has found a failure to satisfy either of the first two and still found the takings claim. Counsel, just following up on my colleague's question on Penn Central, if I understand the facts correctly, there were many conditions precedent that had to be satisfied at any point for them to be able to move forward with their expectation. Correct. In Penn Central you had this historic railroad location. The law provided that they could move the air rights to some other properties that they used to get additional benefits. They were not deprived of the right to use the facility for commercial retail, obviously for railroad use and the like. So, in other words, the Supreme Court analyzed this on the basis that, yeah, there was some restriction on what they could do, just like zoning laws, but they weren't deprived of their reasonable economic expectations. Right. Both because of the location of the air rights and so on. In this case, you've got a situation where you have 3,000 acres of lava, basically. And we could argue about under Muir what the denominator ought to be, but let's say the district court got that right. They had to build a certain number of low and moderate income housing units. I know they say that they got that reduced, and they thought they would. But in order for any of this to be done, there were roads, there were sewers, there were all kinds of things that had to be done. For purposes of our analysis and comparing it with the Penn Central situation, how do we make those fit? How does this become a Penn Central claim, if at all? Well, I don't think it does. And I think what a lot of that goes towards is the second factor, the investment benefits. And there's a couple of points there. The first is the court has to look at the regulatory environment that was in place at the time that Bridge acquired the property. And at that time, in 1999, the 1,000 acres was zoned as urban, but it was subject to an affordable homes commission, a 60% affordable homes commission. And at trial, Bridge's CEO, John Baldwin, testified that Bridge was aware that when it acquired the property at that time, that affordable homes commission made the proposed housing development not viable, not economically viable. And that fact is sort of exemplified in the purchase price of Bridge. That's when they bought it in 1999, right? Yes. Yes, but you heard your opponent say today, and I think it's supported by the record, that they had every reason to believe that they could get that requirement reduced because the commission had, in fact, in other very similar situations, done the same thing. Well, they had done it in the same thing, but in fact the commissioners that testified at trial did state that no two cases were unique, and the commission does have to look at every case on its unique situation. And I think that argument is pretty similar to the same argument that this court rejected in Colony Cove. And in that case, that was a mobile home rent control ordinance case, and the takings plaintiff in that case actually owned several mobile home parks and had been before the rent control board before and argued in that case that when I'd come before the board before for my previous properties, the board had taken into account debt service expenses when determining whether to increase the rent. And this court said, well, just because they did it before, even for your own properties, doesn't mean they were bound to do it again. And this case is even more far removed because Bridges is trying to rely on other properties, not even their own properties. And the Land Use Commission, as I said, has to take every case on its own merits, and there's nothing in the law or any of the Land Use Commission's regulations that required them to grant a reduction in the Affordable Homes Commission. Sorry, in the Affordable Homes Condition. Right, but I grant you there was nothing that required them, but by the same token can't be assumed to act arbitrarily. And so if as an investor you look out and you say, boy, these other six projects look like they're on all fours with ours, and lo and behold, in each and every one of them, the commission granted this reduction, why would I not be entitled, as part of my reasonable investment-backed expectations, to assume they're not just going to treat me in an arbitrary fashion, I'm presumably going to get the same treatment? Well, I think to address that, we have to look at this court's Guggenheim decision. And in that case, what the court did is look at the purchase price that the plaintiff paid for the property to look at whether there's a significant premium paid based on the speculation that they might be able to have the regulatory environment changed. And what the court held is that even if there is a slight premium paid in the purchase price, that's not enough to create what it called a starry-eyed hope into a reasonable expectation. And here there's nothing in the record. Bridge paid $5.2 million for the property in 1999. And the testimony at trial established that without that affordable, the more stringent Affordable Homes Commission, it would be valued, have a market value of $40 million. And so there's nothing in the purchase price Bridge paid to show any, a premium to show there was a reasonable expectation that this property might be able to become viable. So from your perspective, what Bridge paid in 1999 already factored in, no change basically in the low and moderate income housing? Yes, and that's something the court under Guggenheim has to look at. Yes, yeah. Unless the court has any more questions on the Penn Central analysis, since I'm more than halfway through my time, I'd like to turn to Bridge's appeal regarding the exclusion of the expert testimony. So what I would like to point out, as this court sort of already addressed, is that the district court did rely on several different bases to exclude Mr. Berger's testimony. And there are two bases that Mr. Berger's testimony was neither reliable nor relevant under Federal Rule of Evidence 702 and Doebert, that those bases do not require the court to look at the multifactored analysis under the Rule 37C1 sanctions. Those are reviewed for abuse of discretion, and the district court was absolutely right on both of those. So first, the district court ruled that Mr. Berger's testimony was not relevant for two reasons. First, it didn't purport to establish a reasonable market rate of return, which is required when a just compensation theory depends on a taking over a certain period of time. And second, even if Bridge were correct, which it is not, that the rate of return can be based on a plaintiff's own historic rate of return, that's not what Berger's testimony was to establish. He relied solely on Bridge Capital's historic rate of return, which is not a party in this case. It doesn't own Bridge. It's not a parent company of Bridge. The only testimony at trial showed that Bridge Capital managed Bridge and was owned by one of the members of Bridge Capital. But go back to the first ground. You've heard your opponent say that, no, actually the cases are very clear, that it's the plaintiff's own. The plaintiff himself or herself would have done with the money that controlled. I'm sorry, I didn't catch that last part. That's why it's helpful just to let the person finish asking the question, and then you'll know what the question was. So let me start over, and maybe you won't interrupt this time. Your opponent says that the cases are very clear, that it is, in fact, what the plaintiff himself, let's say in this case, would have done with that money during that period that is controlling, and that's why the testimony was directly on point. You, I take it, have a very different view of what the law is on that? Yes. I mean, I'm not aware of any controlling cases plaintiff has cited for that proposition. And I think the case in the briefs that plaintiff relied on the most for that proposition I think was the Tulare Lake case, which is a federal court of claims case. And in that case, that's the only case I'm aware of where the court actually did use a rate of return that was based on the plaintiff's own historic rate of return, but it did it for a very specific reason. And in that case, the plaintiff, so the court had, the parties had proposed several different rates of return it could use. And what the court said, it was looking for a reasonable rate of return, an interest rate that provided a reasonable rate of return consistent with a high level of safety. And what it did, in that case, the Tulare Lake plaintiff had invested in state-sanctioned investments, and there was evidence in the record in that case that those investments did provide a reasonable rate of return that provided a consistent return with a high level of safety. And that's the only reason the court adopted the plaintiff's historic rates of return in that case. It seems like what you're saying is that the court each time will look, what the individual people do is important, but it's got to be realistic. For example, in Penn Central, they had these properties that were adjacent. They could have moved the air rights there and made it a substantial rate of return. So is it not correct that in this case, what Bridge intended, or its actual results in the past, would be somewhat relevant here? Well, I don't think it would, but I think it would be more relevant. It would be closer to being relevant. If Mr. Berger, in his proposed testimony, had said, okay, these are Bridge's historic rates of return, or let's say we can use Bridge Capital for the sake of argument. These are Bridge Capital's historic rates of return. This is what they got. I believe this is reasonable for whatever reasons. He's an expert, so presumably he would be permitted to testify on that. But he didn't do that. That's not what Mr. Berger's report states, either in the original report or in either of the two proposed supplements that the district court excluded. All he stated was that these are Bridge Capital's historic rates of return, period. There's nothing in there or any other of the evidence Bridge established at trial that a jury could use to determine whether or not that was a reasonable or prudent investment or would maintain a high level of safety. I'm almost out of time, so I'll just conclude by asking the court to either remand with instructions to vacate the jury's decision on liability in favor of the state or to affirm the district court's award of nominal damages to Bridge. Thank you, Your Honor. Thank you, counsel. Very well. Bridge has got some rebuttal time. I have two minutes. Thank you, Your Honor. Very briefly, it's important, very important, to look at the jury instructions which were agreed to in this case. The state agreed to jury instructions that Penn Central was a multi-factor test with issues whether the taking goes too far, and that was a question for the jury to find. Similarly, the state agreed that a denial of all economically viable use, the jury must find a taking. The case was submitted to the jury, and as this court has frequently said, it is predominantly a factual question for the jury as to whether or not there was substantial evidence. The jury, in its wisdom, found that in large part because the state put on almost no evidence of this case. I want to address Judge Watford's questions as to the evidence that Mr. Berger and or Mr. Baldwin could have submitted. Judge, if I indicated to you that I thought it was controlling what the plaintiff earned there, I apologize. That was not my intent. My intent was to say that it is relevant because, again, because the property is taken from the owner under longstanding U.S. Supreme Court law, it is relevant at the very least what the owner would have done with that money, what it could have achieved during the takings period. That was the evidence that Mr. Berger presented through his expert reports. That is what Mr. Baldwin was prepared to testify to and, in fact, did testify to for purposes of liability, just not for damages. In the end, it's not so much that this was controlling, it's whether or not Bridge cut its day in court. It's true that the jury might have found, based on all the evidence, that the state's view of rate of return, that it's more market-based based on CD rates or Treasury bills, they might have found that that was more persuasive. And, indeed, if that's what they found, I would have respected that. Bridge never got that chance. Before you sit down, can you just respond on the Penn Central second prong? Yes. Your opponent says, well, hey, look at how much you paid for the property in 1999. That tells you right there that sort of baked into the very low price you paid you weren't going to be able to count on getting the 60% requirement reduced. Absolutely not true. Part of the dilemma there is this is appellate counsel who wasn't there at trial. What happened is Bridge bought the property at the absolute bottom of the Hawaii real estate market, bought this property out of a foreclosure by a major Japanese bank that was going out of business in Missouri. The price reflected the economic times and the fact that it was in foreclosure, not the affordable housing condition or lack thereof. And this gets to the point that this circuit, in fact, has made, in a different context than Lucas in Del Monte Dunes, that you can't conflate other economic circumstances that exist outside with what is happening with this specific property. Thank you. Thank you. Thanks to both counsel. This is an interesting and challenging case. We thank you for your learned presentations. The court will take this matter under submission. The case just argued is submitted, and the court stands at recess for the day.
judges: Graber, M. Smith, Watford